Filed 2/18/21  P. v. Hernandez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JULIAN HERNANDEZ,<br><br>    Defendant and Appellant. | F077476<br><br>(Kern Super. Ct. No. BF160644A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In the early morning hours of June 26, 2015, Officer David Nelson of the Bakersfield Police Department was driving a marked patrol car when he attempted to perform a traffic stop on a vehicle driven by appellant and defendant Julian Hernandez. Defendant failed to comply and accelerated away. Nelson pursued defendant in a highspeed chase as defendant's car reached speeds of 90 to 100 miles per hour on city streets. As Nelson turned right to follow defendant, the tires on Nelson's patrol car went into a skid, and the vehicle rotated clockwise, hit a curb and rotated counterclockwise, and crashed into a pole and a wall. Nelson died within minutes from blunt injuries to his chest from the impact.

Defendant was charged and convicted of the second degree murder of Officer Nelson (Pen. Code, § 187, subd. (a))[1] with the special allegation that the victim was a peace officer killed in the performance of his duties (§ 190, subd. (b)), and other felonies with a prior prison term enhancement. He was sentenced to 25 years to life.

On appeal, defendant contends his murder conviction must be reversed for insufficient evidence. He raises several instructional contentions and asserts the court erroneously instructed the jury on both causation and implied malice, and the instructions allegedly reduced the prosecution's burden of proof to prove defendant's conduct was the cause of Officer Nelson's death.

Defendant further argues the court's evidentiary rulings were erroneous because it excluded evidence that Officer Nelson was not wearing his seatbelt and admitted evidence about defendant's prior acts of speeding violations and failing to obey commands from law enforcement officer in unrelated incidents.

We will strike the prior prison term enhancement and otherwise affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

# FACTS

## The pursuit

At 2:37 a.m. on June 26, 2015, Officer Nelson broadcast over the radio that he was in pursuit of a subject in an unlicensed Hyundai who failed to yield, and the subject was going northbound on Haley Street at 60 miles per hour. Nelson reported the suspect had committed Vehicle Code violations and the vehicle had accelerated to 75 miles per hour.

It is undisputed that defendant was driving the Hyundai. It is also undisputed that Officer Nelson was in uniform and driving a marked patrol car, and the patrol car's siren and emergency lights were activated during the entirety of the pursuit.

Officer Ryan Clark was on patrol that night and had been in communication with Officer Nelson earlier in the evening. He heard Nelson broadcast in a "very hurried" voice that a vehicle was fleeing from him, and he was trying to follow it.

Officer Brandon McNamara also heard Officer Nelson's dispatch and headed to the general area. He saw the emergency lights from Nelson's patrol car, but he was too far behind to keep up with the pursuit, or to see defendant's car or the fatal crash.

The investigating officers later recovered security videos from several businesses that showed parts of the pursuit through the city streets. The videos were played for the jury and examined by accident reconstruction experts to determine the route of the pursuit, and the speeds reached by both Officer Nelson and defendant.

The first video showed defendant's silver Hyundai stopped in front of a fireworks stand in a parking lot. Officer Nelson's patrol car pulled behind defendant, and the vehicle's spotlight was aimed at the Hyundai, consistent with trying to perform a traffic stop.

Defendant's car remained in the parking lot for about six seconds, and then it sharply accelerated onto Haley Street. Officer Nelson followed defendant's car, and the patrol car's overhead lights were on.

3.

Detective Jared Diederich, an accident reconstruction expert with the police department's major collision investigation team, testified Officer Nelson's pursuit of defendant's car began at the corner of Haley and Flower Street, where the speed limit was posted at 35 miles per hour.

Detective Diederich testified as the pursuit continued on Haley, the posted speed limit was 40 miles per hour. The pursuit continued without interruption on Haley Street, and through intersections where there were traffic lights and pedestrian crosswalks. Defendant turned onto Panorama, where the posted speed limit was 45 miles per hour through the intersection of Mount Vernon, and Officer Nelson followed him.

Detective Diederich testified that based on time and distance analysis of the videos, he determined defendant's car was traveling at speeds of 102 miles per hour, 98 miles per hour, 91 miles per hour, and 66 miles per hour, and ran stop signs to maintain these speeds. Officer Nelson was between six to 17 seconds behind defendant's car. At least one video showed defendant driving through a posted stop sign at a steady speed without slowing. Nelson continued to follow him, and the patrol car's flashing lights were still on.

Officer Michael Bright, a member of the California Highway Patrol multidisciplinary accident investigation team (MAIT), also analyzed the videos, and determined defendant's car was going 85.11 miles per hour while Officer Nelson's patrol vehicle was going 86.52 miles per hour behind it, between Haley and Mount Vernon.

**The shotgun**

Along the route of the pursuit, the investigating officers later recovered a 12-gauge pump shotgun, parts from its broken wooden stock, four live, red shotgun shells, and a grey T-shirt. The gun and other items were scattered along a driveway on Panorama Drive near Mount Vernon Avenue. There was a spent black shotgun shell in the weapon; DNA found on that shell was consistent with defendant's DNA.

Based on the shotgun's location and the defendant's route, it appeared the shotgun had been tossed from the Hyundai's passenger window during the pursuit.

**The fatal crash**

As the pursuit continued, defendant turned right onto Panorama Drive to Mount Vernon Avenue. Officer Nelson also made the right turn to continue the pursuit, but he lost control of his vehicle.

Officer Bright testified that based on his examination of the videos and tire friction marks at the scene, Officer Nelson turned right in such a way that his patrol car's tires started to lose friction and went into a skid. Bright could not determine why Nelson turned right "more sharply than the radius of the centerline of the eastbound number two lane of Panorama Drive at a minimum speed of 70 miles per hour." "The faster you try to go through a turn, the more likely it is that you're going to slide out."

Officer Bright testified that after the turn, Officer Nelson's patrol car went into a counterclockwise rotation. Based on the skid marks, Bright determined Nelson tried to steer out of it. Nelson's car hit a curb, and then hit a second curb that sent the patrol car into a clockwise spin. Nelson's patrol car crashed into a pole and a brick wall.

In Officer Bright's opinion, Officer Nelson's patrol car crashed into the wall because of the process that began when he made the right turn, and the car began to lose traction. "The accident is the car striking the wall; so the cause that we're looking at for that is what caused the car to strike the wall, and the cause that we determined was the combination of the turning path taken by the driver and the speed of the vehicle." Bright did not know why Nelson made the right turn in that manner.

**Officer Nelson's death**

Officer McNamara tried to catch up with Officer Nelson during the pursuit but lost sight of his patrol car. When he reached the corner of Panorama Drive and Mount Vernon Avenue, McNamara saw a patrol vehicle without any lights that had crashed. Officer Clark and the paramedics also arrived. They found Nelson in the driver's seat,

and he did not have a pulse. Nelson's patrol car caught fire, and the paramedics removed him from the burning vehicle.

Officer Nelson was taken to the hospital where he died of blunt injuries to his chest. The pathologist testified a deceleration injury refers to situations where there is a head-on vehicular collision into a wall or pole and, upon sudden impact, the heart moves forward and the aorta tears. Nelson suffered a deceleration injury resulting from the crash that completely tore the upper part of his aorta, and he died within a few minutes of the impact.

### DEFENDANT'S ARREST

At 11:00 a.m. on June 27, 2015, Officer Louis Rodriguez and his partner went to an apartment on an anonymous tip. The apartment's door was open. Rodriguez knocked for 20 minutes and no one answered. A silver Hyundai was parked in the apartment's garage.

After about 25 minutes, Veronica Navarrete came to the apartment's door and told Officer Rodriguez that she was home with only her children and a girlfriend. Rodriguez asked if any men were in the apartment. Navarrete said her boyfriend "Jose" might be there. Rodriguez entered the apartment and encountered Jose Gutierrez and defendant Julian Hernandez.

Defendant's identification was in the Hyundai, and his fingerprints were on the exterior of the front passenger door's window. A 12-gauge shotgun shell was in the car's trunk.

**Defendant's letter**

When Officer Rodriguez found defendant in the apartment, defendant gave him a handwritten letter.[2]

---

[2] Defendant's letter consisted of three pages. The court granted defendant's motion to only admit the first page, and to exclude the second and third page as prejudicial and hearsay.

"I Julian Hernandez, am the one who fled from the officer who was trained and prepaird for encounters as such in witch he unfourtunetly lost his life because he lost control of the situation! And lost controle of his training and witch I am your basic average citizin who because of my past, chose to run away from being shot, tazed runover or beaten by battons, like by only BPD and my wife cheeted on me with a BPD officer whom I have been threatened by and if there going to beat/hurt me why not take the slim odds of getting away and not getting hurt! Why did he fallow me in the 1st place profileing me because I got tatoos and it was late that was without cause stop witch triggerd flashbacks when he put his hand on his gun I got angziety and ran away." (Spelling and grammatical errors in the original.)[3]

Defendant signed the letter in Rodriguez's presence and said he had been writing the letter " 'when the officers arrived.' "

## Defendant's postarrest statement

Officer Rodriguez took defendant into custody and drove him to the police department. During the drive, defendant initiated a conversation with Rodriguez and asked if it was possible for one of the officer's "buddies to get out of uniform and go at it" with him.

## Defendant's postarrest interview

At 8:45 p.m. on June 27, 2015, Sergeant James Moore met with defendant at the police department and advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant understood the advisements and agreed to answer questions. He did not appear under the influence of drugs. The interview was recorded.

Defendant admitted he was driving the silver Hyundai that was pursued by Officer Nelson. Defendant said he had been staying with Navarrete and borrowed her car because he wanted to drive around and think about his next move with his wife and kids.

Defendant said the Hyundai had valid license plates, but he covered them with paper plates before he drove away from the apartment.

---

[3] In issue VI, *post*, we will address the court's decision to admit evidence of his prior acts of fleeing from the police, including his references in this letter to being "tazed" and hit by batons.

Defendant said that when he was driving around, he was very angry with his wife because they had ongoing problems, and she would not let him see his kids. He thought his wife was having an affair with a Bakersfield police officer and felt his whole world was coming down on him.

Defendant said he saw Officer Nelson at the beginning of the pursuit when he looked in his rearview mirror. He described Nelson as having a bald head and a " 'walking attitude.' " Defendant knew he was being pursued by a Bakersfield police officer because he saw his uniform, heard the siren, and saw the flashing lights. Defendant claimed he saw Nelson's right hand reach down to his sidearm. Defendant also saw the patrol car's spotlight.[4]

Defendant said that at one point during the pursuit, he thought about driving off the bluffs because that would solve all his problems. Defendant described the route of the pursuit, said he had taken it many times, and he used a route that would eventually lead to his wife's residence.

When defendant described his route, he failed to mention his turn onto the street where the officers found the shotgun on the side of the road. When Sergeant Moore later asked him about the shotgun, defendant did not initially admit he had the gun but then said it was in the car. Defendant said it was a 12-gauge shotgun that he modified by taping a flashlight to the barrel. It was wrapped in something grey, and it was loaded with black and red rounds. Defendant said he threw it out of his car's passenger window. Defendant identified the shotgun retrieved by the police as the weapon.[5]

Sergeant Moore asked defendant how fast he was going at particular times of the pursuit. Defendant said "he just mashed the accelerator all the way down to the floor."

---

[4] Defendant's statement about the spotlight corresponded to the first video, that showed Officer Nelson shining his patrol car's spotlight on defendant's car as he pulled out of the parking lot at the beginning of the pursuit.

[5] A grey shirt was found on the street near the shotgun; there was a black expended shell in the weapon, and red live shells on the street.

He was surprised the car "would go so fast," and that was how he was able to get away from the officer. Defendant said he was "way ahead" of Officer Nelson. Defendant compared it to how fast he went when the police pursued him during an incident that occurred when he was younger.[6]

Sergeant Moore asked defendant if he remembered running stop signs. Defendant knew he ran a stop sign, but he was not sure if he ran through stoplights because "he just wasn't paying attention."

Sergeant Moore asked defendant why he did not just stop the car. Defendant said "he wouldn't stop for Bakersfield Police. He actually said if it was a sheriff he may have stopped, but not for the Bakersfield Police Department." Defendant said he wanted to go "toe to toe" and "get in the ring" with a Bakersfield police officer and would have been in a shootout with the police if he still had the shotgun at the end of the pursuit.

Sergeant Moore testified that defendant appeared remorseful but "at other points he seemed agitated and angry." Moore asked defendant whether someone could have been hurt by the way he was driving. Defendant said "he really wasn't thinking about it," and "he did not care if he got hurt." Defendant said he was hearing voices that told him to turn left and right, and he did not know why the voices were telling him that. Defendant also said that his mind would go blank on occasion. Defendant said after the pursuit ended, he drove back to Navarrete's apartment.[7]

**Defendant's prior speeding citations**

The prosecution introduced evidence of defendant's prior driving history. Eric Light, a supervising investigator with the Department of Motor Vehicles (DMV), testified that his duties included being asked to look into an individual's driver's license history,

_____

[6] As previously noted, we will address the court's admissions about defendant's prior acts of fleeing from the police in issue IV, *post*.

[7] A video camera showed that at approximately 2:43 a.m., the Hyundai returned to Ms. Navarrete's apartment complex.

9.

DMV forms, and traffic citations. Mr. Light testified the prosecutor asked him to collect certified documents from the DMV about defendant's driving record.

Mr. Light testified based on a computer printout that contained defendant's driving records, and the records contained "a conviction section … that shows various Vehicle Code sections violated, in addition to those that would fall into the speeding category." Mr. Light testified the records showed the dates, docket and citation numbers for each of defendant's prior traffic citations as follows: failure to stop at a limit line and driving 85 miles per hour in a posted 40 miles per hour zone in April 2001; driving 81 miles per hour in a posted 65 miles per hour zone in January 2004; driving 104 miles per hour in a posted 65 miles per hour zone in March 2007; and driving 73 miles per hour in a posted 55 miles per hour zone in May 2010.

Mr. Light testified that defendant signed standard documents when he applied for a driver's license, where he agreed to take a chemical test to determine whether he was under the influence if requested by an officer, and advising him that it was extremely dangerous to human life to drive under the influence of alcohol and/or drugs, and he could be charged with murder if he did so and someone was killed.[8]

**Defendant's prior incidents of fleeing from the police**

The prosecution also called officers to testify about defendant's prior acts when he ignored their orders and fled from them.[9] Officer Rudy Berumen testified that on December 4, 2007, he responded to assist officers with a fleeing suspect, later identified as defendant. As Beruman drove up to the location, he saw defendant running away. Beruman got out of his patrol car and ordered defendant to stop, but defendant failed to do so. Beruman was fairly close to defendant and had to use his baton to detain him, and

---

[8] In issue VI, *post*, we will address defendant's contentions about the court's introduction of his prior acts, including his prior speeding tickets; and in issue VII, *post*, his arguments that Mr. Light's testimony constituted inadmissible testimonial hearsay.

[9] In issue VI, *post*, we will address defendant's contentions that the court erroneously admitted this evidence of his prior acts where he fled from the police.

10.

that left red marks on defendant's legs. There were two other officers present, and they also had to use force to restrain him.

Detective Dennis Park testified that on October 3, 2010, he conducted an investigation on the street when a car approached his location. Defendant was sitting in the car's passenger seat. The car stopped and something caught Park's attention. Park directed defendant to get out of the car. Defendant got out and backed away from Park. Park ordered him to stop, but defendant ran away. Park followed defendant in his patrol car and activated his lights and siren. Defendant stopped running and appeared to be out of breath. Park parked his car and got out, but defendant turned and ran way. Park got back into his patrol car and resumed the pursuit. As the chase continued, defendant suddenly changed direction and ran into Park's patrol car while it was still moving. Defendant's shoe was caught under the front driver's side tire. His foot was injured, he lost his balance, and he fell. Park ordered defendant to stay down but he tried to get up. Park had to use his baton to restrain him and take him into custody.

Officer Sean Woessner testified that on April 11, 2012, he was on patrol in Bakersfield and looking for defendant. Once he located defendant, he ordered him to stop, but defendant ignored the order and ran away. Defendant was eventually apprehended after he ran into a house.

Defendant did not testify, and the defense did not introduce any evidence.

## PROCEDURAL BACKGROUND

On July 23, 2015, an information was filed in the Superior Court of Kern County charging defendant with count 1, second degree murder of Officer Nelson (§ 187, subd. (a)), with the special allegation that he was a peace officer killed in the performance of his duties (§ 190, subd. (b)); count 2, recklessly evading a peace officer causing death (Veh. Code, § 2800.3); count 3, possession of a firearm by a felon (§ 29800, subd. (a)(1)); count 4, possession of ammunition by a felon (§ 30305,

subd. (a)(1); and count 5, unlawfully carrying a loaded firearm in a vehicle (§ 25850, subd. (c)(1)).

As to counts 1 and 2, it was alleged that defendant was armed with a firearm during the commission of the offense, a 12-gauge shotgun (§ 12022, subd. (a)(1)), and as to all counts, that defendant had one prior prison term enhancement (§ 667.5, subd. (b)).

On March 21, 2018, defendant's jury trial began with the People's case.

**Second degree murder instruction**

As to count 1, the jury received CALCRIM No. 520 on the elements of second degree murder and implied malice.[10]

> "The defendant is charged in Count 1 with murder in violation of Penal Code section 187.

> "To prove that the defendant is guilty of this crime, the People must prove that:

> "One, the defendant committed an act that caused the death of another person;

> "And, two, when the defendant acted, he had a state of mind called malice aforethought.

> "There are two kinds of malice aforethought:  Express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.

> "The defendant acted with express malice if he unlawfully intended to kill.

> "The defendant acted with implied malice if:

> "One, he intentionally committed an act;

> "Two, the natural and probable consequences of the act were dangerous to human life;

---

[10] In issues II and III, *post*, we will address defendant's contentions that the court erroneously modified CALCRIM No. 520 to omit the definitions of causation and implied malice.

12.

"Three, at the time he acted, he knew his act was dangerous to human life;

"And, four, he deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time…."

**Verdict and sentence**

On April 5, 2018, the jury found defendant guilty of all charges, and found true the special circumstance allegation and the firearm enhancement.[11] The court found the prior prison enhancement true.

On May 4, 2018, the court sentenced defendant to an indeterminate term of 25 years to life on count 1, second degree murder, plus one year for the firearm enhancement and one year for the prior prison term enhancement; and the upper term of three years for count 4, possession of ammunition, plus one year for the prior prison term enhancement. The court stayed the terms for the remaining convictions and enhancements pursuant to section 654.

On May 8, 2018, defendant filed a timely notice of appeal.

## DISCUSSION

### I.    Substantial Evidence of Second Degree Murder

Defendant argues his conviction for second degree murder must be reversed because there is insufficient evidence of implied malice. Defendant asserts that while highspeed chases "certainly can be dangerous, that possibility is not enough for implied malice" and the "overwhelming majority of highspeed pursuits do not end in death or serious injuries." Defendant argues the circumstances of the pursuit in this case did not

---

[11] The parties stipulated that defendant suffered a prior felony conviction for purposes of counts 3, 4, and 5.

justify "the finding that his conduct created the degree of danger necessary to constitute implied malice."

Defendant further argues there was insufficient evidence that death would result from defendant's flight since the pursuit was not " 'likely' " but was only " 'capable' " of causing death. He notes that Officer Nelson was going 70 miles per hour when he lost control of his patrol car, traffic was light to nonexistent, Nelson did not have to swerve to avoid a pedestrian or another car, and the collision and his death only resulted from his inability to control his own patrol car and not wear his seatbelt.

## A. *Substantial Evidence*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be

14.

reconciled with a contrary finding does not warrant a reversal of the judgment." '
[Citations.]" ' [Citation.]" (*People v. Rodriguez, supra*, 20 Cal.4th at p. 11.)

**B.** ***Second Degree Murder***

"Murder is the unlawful killing of a human being with malice aforethought.
[Citation.] Malice may be either express or implied. It is express when the defendant
manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.'
[Citation.]" (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 842 (*Canizalez*).)

Malice "is implied 'when no considerable provocation appears, or when the
circumstances attending the killing show an abandoned and malignant heart.' [Citations.]
Malice should be implied when ' " 'the killing proximately resulted from an act, the
natural consequences of which are dangerous to life, which act was deliberately
performed by a person who knows that his conduct endangers the life of another and who
acts with conscious disregard for life.' " ' [Citation.] Implied malice requires that the
defendant act with a wanton disregard for the high probability of death [citation], thereby
requiring a *subjective awareness* of a high degree of risk. [Citation.] It is not enough
that a *reasonable person* would have been aware of the risk. [Citation.] Malice may be
inferred from the circumstances of the murder. [Citation.]" (*Canizalez, supra*, 197
Cal.App.4th at p. 842; *People v. Soto* (2018) 4 Cal.5th 968, 974.)

A finding of implied malice thus "depends upon a determination that the defendant
*actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation.]" (*People v.
Watson* (1981) 30 Cal.3d 290, 296–297 (*Watson*).) "Even if the act results in a death that
is accidental …, the circumstances surrounding the act may evince implied malice.
[Citations.]" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110, fn. omitted (*Nieto
Benitez*); *People v. Contreras* (1994) 26 Cal.App.4th 944, 954 (*Contreras*).)

"Considerations such as whether the act underlying the homicide is a felony, a
misdemeanor or inherently dangerous in the abstract, are not dispositive in assessing
whether a defendant acted with implied malice. [Citation.]" (*Contreras, supra*, 26

Cal.4th at p. 954.)  Instead, a finding of implied malice must be based upon "consideration of the circumstances preceding the fatal act.  [Citations.]"  (*Id*. at p. 107; *Contreras, supra*, 26 Cal.App.4th at pp. 954–955.)

"In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another – no more, and no less."  (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)  "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life" as required for implied malice "is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' "  (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988.)

### C.   *Vehicular Homicide Cases*

It is well settled that causing a fatal traffic collision may support a conviction for second degree murder based on implied malice.  (*Watson, supra,* 30 Cal.3d at pp. 300–301; *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358.)  In *Watson,* the leading case, the defendant was intoxicated, drove at highspeeds, hit another car, and killed the occupants.  (*Watson,* at pp. 292–294.)  *Watson* explained that such a homicide involved implied malice if "a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life.  [Citations.]"  (*Id*. at p. 296.)  *Watson* held there was substantial evidence to find defendant acted with conscious disregard for life because he consumed enough alcohol to impair his physical and mental faculties even though he knew he was going to drive later, he was aware of the hazards of driving while intoxicated, he drove at highspeeds on city streets and created a great risk of harm or death, and he was aware of the risk based on a near collision and a belated attempt to brake just before the fatal crash.  (*Id.* at pp. 300–301.)

Implied malice murder cases are not limited to vehicular homicides caused by intoxicated drivers.  (*Contreras, supra*, 26 Cal.4th at p. 955; *Canizalez, supra*, 197 Cal.App.4th at pp. 837-838.)  In *People v. Fuller* (1978) 86 Cal.App.3d 618 (*Fuller*), the defendants tried to escape after a burglary and led police on a highspeed chase.  They hit

another car, resulting in that driver's death. (*Id*. at pp. 621–622.) Both defendants were charged with murder, but the trial court reduced the charge to vehicular manslaughter. In a People's appeal, *Fuller* reversed the trial court's dismissal of the murder charge and held the defendants could be charged with felony-murder doctrine based on the underlying burglary. (*Id*. at pp. 624, 627–628.)

*Fuller* further held the defendants could be prosecuted for second degree murder based on implied malice. (*Fuller, supra*, 86 Cal.App.3d at p. 628.)

> "[The defendants'] conduct was more than grossly negligent. The conduct clearly presents an issue of fact as to whether or not [the defendants] exhibited a wanton and reckless disregard for human life. [The defendants] drove at highspeeds through main thoroughfares of Fresno in an attempt to elude [the officer]. At one point in the chase they drove on the wrong side of Herndon Avenue and caused oncoming cars to swerve off of the road to avoid a head-on collision. They then made a U-turn and sped back to Blackstone Avenue, ran a red light and caused other traffic to stop to avoid a collision. [The defendants] then drove down Blackstone at speeds estimated between 60 and 75 miles per hour and headed straight at two oncoming police vehicles which were attempting to block their flight. [The defendants] did not reduce their speed as they approached the officers' vehicles, and only a last minute maneuver by the officers avoided a possible fatal collision. At the next intersection [the defendants'] vehicle which 'hadn't slowed down very much' ran the red light and struck and killed the driver of the other car. Under these facts the foreseeability of serious injury or death was apparent to respondents. [Citations.]" (*Id*. at p. 629.)

In *Contreras, supra,* 26 Cal.App.4th 944, the defendant was a " 'tow bandit' " or " 'bird-dogger' " tow truck driver, who illegally monitored emergency calls on police scanners and raced to accident scenes to tow disabled vehicles. (*Id*. at p. 948.) The defendant had numerous citations and arrests for speeding, running red lights, and reckless driving. (*Id*. at pp. 948–950.) There was conflicting evidence whether the defendant knew his brakes were not properly functioning on the day of the fatal collision, when he again raced another tow truck driver to the scene of a collision, going 60 to 70 miles per hour. Both trucks hit a dip in the street, went airborne, made screeching sounds

when they landed, and did not slow down. The defendant's truck rear-ended a car, sending the vehicle into the air, and the passenger in that car was killed. (*Id*. at p. 952.)

*Contreras* affirmed the defendant's conviction for second degree murder based on implied malice. (*Contreras*, *supra*, 26 Cal.App.4th at pp. 956–957.)

> "Based on his driving record, his prior accident, and the known inadequacy of his brakes on the date in question, the issue was not whether [the defendant] would have a serious traffic accident, but when. [¶] Although there was evidence from which it could be argued [the defendant] believed his brakes had been repaired, the jury was entitled to reject that interpretation in favor of the more credible and substantial evidence which demonstrated [the defendant] knew his brakes were malfunctioning and had not yet been repaired." (*Id*. at p. 956.)

In *People v. Moore* (2010) 187 Cal.App.4th 937 (*Moore*), the defendant was convicted of second degree murder when he drove between 80 to 90 miles per hour through city streets because he was angry that his apartment had been burglarized. He was going 70 miles per hour, went through a red light, and hit a second car that resulted in a collision with a third car. The driver of the second car was killed. (*Id*. at pp. 939–940.)

*Moore* held there was substantial evidence of implied malice and the defendant's subjective awareness of the risk. (*Moore, supra*, 187 Cal.App.4th at pp. 941–942.)

> "[The defendant] drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light and struck a car in the intersection without even attempting to apply his brakes. His actions went well beyond gross negligence. He acted with wanton disregard of the near certainty that someone would be killed. [¶] *Whether [the defendant] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk.*" (*Id*. at p. 941, italics added.)

*Moore* addressed the defendant's argument that there was insufficient evidence of implied malice because his actions were inconsistent with the conduct of defendants in other second degree vehicular murder cases, since he was not intoxicated as in *Watson*,

18.

he did not have "a prior near-miss" just before the fatal collision as in *Fuller*, and he did not have numerous citations for traffic violations or a prior arrest for reckless driving, did not know his brakes were defectives, and was not racing another vehicle as in *Contreras*. (*Moore, supra*, 187 Cal.App.4th at pp. 941–942.) *Moore* acknowledged that the defendant's conduct was not similar to the circumstances in the other cases but clarified "none of those cases hold that implied malice could not be found in the absence of those facts. The question of implied malice is to be decided in light of all the circumstances. [Citation.] Here a properly instructed jury found implied malice. Under all the circumstances, the finding is reasonable." (*Id*. at p. 942.)

In *Canizalez, supra*, 197 Cal.App.4th 832, two defendants raced their cars on residential streets and reached speeds of 87 miles per hour. Both vehicles raced through a stop sign at an intersection and hit another car that burst into flames, killing three of the four occupants. Both defendants were convicted of second degree murder. (*Id*. at pp. 837–838, 844.) On appeal, the defendants did not dispute they were speeding in a street race, but argued they were only guilty of vehicular manslaughter because there was insufficient evidence they acted with conscious disregard for life or that they were aware of the risk involved in their conduct. (*Id*. at p. 842.)

*Canizalez* held there was "overwhelming" evidence of implied malice to support the murder convictions, and the defendants' contrary arguments ignored "a tsunami of contrary circumstantial evidence …." (*Canizalez, supra*, 197 Cal.App.4th at p. 842.) The defendants were "fully aware of the conditions at the accident scene which would make racing there dangerous. They had long resided [in the area], within yards of where the fatal crash took place, and inferentially knew the residential nature of the neighborhood, the traffic conditions, caused in part by cars entering and exiting the only exit from [a mobile home park]…, the presence of a four-way stop sign …, and the presence nearby of [a high school]." (*Ibid*.)

19.

*Canizalez* agreed with the trial court's finding that they had been " 'engaged in a speed contest - at 80 or 90 miles per hour. How much more knowledge do they need? They've got a thousand - several thousand-pound vehicle that they're running at 70, 80 miles per hour. I mean, what does it take for a person to understand that what they're doing is inherently dangerous to human life?' " (*Canizalez, supra*, 197 Cal.App.4th at p. 843.) "This mountain of circumstantial evidence overwhelming establishes [defendants'] subjective awareness of the risk of death that their racing created and their callous indifference to its consequences." (*Id*. at p. 844.)

### D.    *Analysis*

There is overwhelming evidence to support defendant's conviction for second degree murder based on implied malice and his subjective awareness of the risk. Defendant covered the Hyundai's license plates with "paper plates," placed his loaded shotgun into the car, and left in the vehicle. Officer Nelson attempted to perform a traffic stop on the vehicle. In his letter and postarrest statements, defendant admitted he knew Nelson was trying to stop him, but instead, he immediately drove away and led him on a highspeed chase. Defendant also admitted that he knew he was being followed by a police officer, he saw the patrol car's flashing lights and heard the siren, and he intentionally refused to slow down or stop. He reached speeds of 90 to 100 miles per hour, went through stoplights and stop signs, and made various turns.

Also, in his postarrest interview, defendant said he "just mashed the accelerator all the way down to the floor." He knew he went through at least one stop sign but said he "just wasn't paying attention." When asked if he knew someone could have been hurt by the way he was driving, defendant said "he really wasn't thinking about it," and "he did not care if he got hurt." Defendant compared the pursuit to a similar incident that occurred when he was younger and pursued by an officer. Defendant said he did not stop because he knew a police officer was following him, he was angry because he thought his wife was having an affair with a police officer, and he might have stopped if he was

20.

being pursued by a sheriff's deputy. Defendant added that he wanted to go "toe to toe" and "get in the ring" with a police officer, and would have gotten into a shootout with the police if he still had his shotgun at the end of the pursuit.

Defendant's subjective knowledge and intent were further shown by the letter he handed to Officer Rodriguez when he was arrested the morning after the highspeed pursuit. Defendant wrote that he fled from the officer and knew the officer had died but tried to blame the officer for trying to perform the traffic stop. Defendant also wrote that he intentionally fled because of his alleged belief his wife was having an affair with a police officer.

The jury in this case could have rationally concluded that this evidence demonstrated defendant knew his conduct was dangerous to human life and he deliberately acted with conscious disregard for life. His letter and postarrest statements further demonstrated his subjective awareness of the risk from his conduct and that he actually appreciated the risk involved.

Defendant argues there is insufficient evidence of implied malice because Officer Nelson was going 70 miles per hour when he lost control of his patrol car, traffic was light to nonexistent, Nelson did not have to swerve to avoid a pedestrian or another car, and his death only resulted from his inability to control his own patrol car and not wear his seatbelt.[12] As explained in *Moore*, defendant's conduct need not have been similar with those in other second degree vehicular murder cases to support the jury's finding of implied malice. (*Moore, supra*, 187 Cal.App.4th at pp. 941-942.) Also as explained in *Moore*: "Whether [the defendant] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk." (*Id.*

---

**12** As we will explain in issue V, *post*, the trial court excluded evidence that Officer Nelson was not wearing his seatbelt at the time of his fatal collision, and defendant challenges that ruling and argues it prevented him from presenting a defense.

21.

at p. 941.) Such a conclusion is particularly supported by defendant's express disdain for the risk resulting from his conduct because he knew he was being pursued by a Bakersfield police officer, and said he would not stop for a police officer and would have preferred to get into a shootout with the police. A reasonable jury could conclude that defendant's conduct showed a conscious disregard of the danger he posed not only to others but particularly to Officer Nelson as defendant led him on the highspeed pursuit.

Defendant argues the sufficiency of the evidence must be "tested against the correct jury instructions" and "[i]t cannot be credibly maintained that all or even most highspeed pursuits … are 'likely' to result in death or present a 'high probability' that that result. [¶] While the fact that death occurred may be some evidence of its likelihood … that fact does not make the consequence likely. It merely shows that it was possible." We will address defendant's instructional contentions below. However, defendant asserts his substantial evidence challenge on this specific point is supported by *In re B.M.* (2018) 6 Cal.5th 528 (*B.M.*), where the court reversed a finding that a juvenile committed an assault with a deadly weapon, identified as a butter knife, in violation of section 245, subdivision (a)(1). *B.M.* held there was insufficient evidence that the butter knife in the juvenile's case was " ' "capable of producing and likely to produce, death or great bodily injury." ' [Citation.]" (*B.M., supra*, at p. 530.) *B.M.* further held that "for an object to qualify as a deadly weapon based on how it was used, the defendant must have used the object in a manner not only capable of producing but also *likely to produce* death or great bodily injury. The extent of any damage done to the object and the extent of any bodily injuries caused by the object are appropriate considerations in the fact-specific inquiry required by section 245[, subdivision] (a)(1). But speculation without record support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not appropriate." (*Ibid*.)

*B.M.* is inapposite to the determination of whether there is substantial evidence of implied malice based on defendant's subjective knowledge of the risk of death resulting

from a highspeed chase. As discussed in *Canizalez,* defendant's arguments on this point ignore "a tsunami of contrary circumstantial evidence" showing his subjective awareness of the risk, in addition to direct evidence from defendant's letter and postarrest statements, and his comparison of this incident to a previous highspeed pursuit with a law enforcement officer. (*Canizalez, supra*, 197 Cal.App.4th at p. 842.)

## II. The Causation Instruction

Defendant next argues the trial court committed prejudicial error because it did not give the CALCRIM approved instruction on causation, and instead gave an instruction requested by the prosecution that "cobbled together language" from prior CALJIC instructions" and "language lifted from case law." Defendant asserts that by giving the prosecution's requested causation instruction, it erroneously omitted required language from CALCRIM No. 520 and instead improperly instructed the jury using language from CALJIC No. 3.40 and *People v. Brady* (2005) 129 Cal.App.4th 1314 (*Brady*). Defendant asserts the court's instruction improperly expanded the scope of his potential liability and lowered the People's burden of proof.

### A. *Causation*

We begin with the principles of causation in criminal cases. "The principles of causation apply to crimes as well as torts. [Citation.] 'Just as in tort law, the defendant's act must be the legally responsible cause ("*proximate cause*") of the injury, death or other harm which constitutes the crime.' [Citations.] Thus, in the language of the standard jury instruction, to constitute a homicide '... there must be, in addition to the death of a human being, an unlawful act which was a cause of that death.' [Citation.] [¶] But the law, the Supreme Court has noted, ' "defines 'cause' in its own particular way." ' [Citation.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46–47 (*Schmies*); *Brady, supra*, 129 Cal.App.4th at p. 1324.)

"In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable

23.

consequence of the act or omission the death of [the decedent] and without which the death would not occur.' [Citation.] In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' [Citation.]" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*); *Brady, supra*, 129 Cal.App.4th at p. 1324.)

"California courts have adopted the 'substantial factor' test for analyzing proximate cause. '… Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. [Citations.] The substantial factor standard generally produces the same results as does the "but for" rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred "but for" that conduct. [Citations.] The substantial factor standard, however, has been embraced as a clearer rule of causation - one which subsumes the "but for" test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact. [Citations.]" (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1396.)

" ' "There may be more than one proximate cause of the death. When the conduct of two or more persons *contributes concurrently as the proximate cause of the death*, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." ' [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 847.) "Indeed, it has long been recognized that there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death." (*Id.* at p. 846.)

"[T]he 'defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause.' [Citations.]" (*Cervantes, supra,* 26 Cal.4th at pp 866–867.) "The defendant is liable for a crime *irrespective* of other concurrent causes contributing to the harm [citation] …. Moreover, a superseding

cause must break the chain of causation *after* the defendant's act before he or she is relieved of criminal liability for the resulting harm." (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953 (*Wattier*).)[13]

"Intervening causes in criminal cases are typically described as either 'dependent' or 'independent.' A dependent intervening cause will not absolve a defendant of criminal liability while an independent intervening cause breaks the chain of causation and does absolve the defendant. [Citation.] 'An intervening cause may be a normal or involuntary result of the defendant's original act. Such a cause is said to be "dependent," and does not supersede; i.e., the defendant is liable just as in the direct causation case.' [Citation.] An 'independent' intervening 'act may be so disconnected and unforeseeable as to be a superseding cause; i.e., in such a case the defendant's act will be a remote, and not the proximate, cause.' [Citation.] … '[W]here the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.' [Citation.] Stated another way, '[t]he intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.' [Citation.]" (*Schmies, supra*, 44 Cal.App.4th at p. 49, fn. omitted; *Cervantes, supra,* 26 Cal.4th at pp. 871-872.)

"Whether the defendant's conduct was a proximate, rather than remote, cause of death is ordinarily a factual question for the jury unless ' "undisputed evidence … reveal[s] a cause so remote that … no rational trier of fact could find the needed nexus." ' [Citation.] A jury's finding of proximate causation will be not disturbed on appeal if there is 'evidence from which it may be reasonably inferred that [the defendant's] act was

---

[13] We will address defendant's contentions about contributory negligence in issue V, *post*.

25.

a substantial factor in producing' the death. [Citation.]" (*People v. Butler* (2010) 187 Cal.App.4th 998, 1010.)

With this background in mind, we turn to the court's decision about the causation instruction it gave in this case.

**B.** *CALCRIM No. 520*

As explained in the procedural background above, the court instructed the jury with CALCRIM No. 520 on the elements of second degree murder and the definition of implied malice.[14] The pattern instruction also addresses causation, but the court omitted the final two paragraphs that stated:

> "… An act … causes death if the death is the direct, natural, and probable consequence of the … act … and the death would not have happened without the … act …. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.
>
> "There may be more than one cause of death. … An act … causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."[15]

As we will explain, defendant argues the court committed prejudicial error when it omitted these paragraphs.

**C.** *The People's Motion to Modify the Causation Instruction*

Prior to trial, the People filed a brief and stated the second degree murder charge was based on implied malice and evidence that defendant actually appreciated the risk involved from his conduct, consistent with the requisite subjective standard.

---

[14] In issue III, *post*, we will address defendant's separate argument that the instructions did not fully define implied malice.

[15] CALCRIM No. 240 contains identical language about causation for nonhomicide cases.

26.

In addition, the People's brief extensively addressed causation, and stated there were no pattern CALCRIM instructions on superseding intervening acts. The People argued that while CALCRIM No. 520 addressed both implied malice and causation, that instruction incorrectly defined causation (in the paragraphs quoted in part II.B., *ante*) in a manner that was inconsistent with legal authorities. The People argued the court should supplement the pattern instruction with causation language approved in *Brady* and other cases.

### D.     *The Court's Initial Ruling*

At the beginning of the trial, the court addressed the People's arguments about the causation instruction, and discussed whether it should use a different set of jury instructions that had "been approved time and time again through cases that have gone through the appeals process." The court stated:

> "… I am going to give the CALCRIM instructions *but for purposes of proximate causation I am inclined to replace those areas in CALCRIM with the proximate causation instructions as well as reference to particular cases directly on point in the jury instruction packet.* [¶] But since that is not specifically delineated in the motions in limine that will be something that we will discuss before closing arguments. That is the Court's tentative, however, that counsel can rely on." (Italics added.)

The court stated it would use the CALJIC instruction on causation with additional language from relevant cases.

### E.     *The Parties' Arguments*

After the parties rested, the court again addressed their arguments about the causation instruction. Defense counsel requested the entirety of the causation language in CALCRIM No. 520. The prosecutor argued the court should redact the pattern instruction's causation language because it was misleading, give CALCRIM No. 520 on second degree murder and implied malice, and instruct on causation using the CALJIC definitions plus language approved in *Brady* that addressed intervening and superseding causes.

27.

**F.**     *The Court's Ruling*

The court made lengthy findings and decided not to use the causation language in CALCRIM No. 520, and instead give a modified instruction as requested by the prosecution.  The court found the facts of this case were different from other second degree murder cases based on implied malice because defendant was not intoxicated and did not directly inflict the victim's death.

> "In a circumstance such as this, however, a circumstance wherein there very well may be an intervening cause and it is not a cause that is necessarily the direct result of the suspect's behavior in that the suspect's own vehicle, for instance, did not crash into nor collide with a decedent's vehicle, which is what you would typically see in a *Watson*[16] murder, it is something different, and in a circumstance like this, where these facts have been presented to the jury, *this jury is going to have to determine and decide causation, not only as it relates to cause in fact, but also as it relates to proximate cause, and the foreseeability determination is something that this Court has to properly instruct this jury to make any appropriate determinations that they deem necessary based on the evidence that's been presented in this courtroom.*

> "*This is not a unique situation*, nor is it a situation where this courtroom is creating new law since this has been an issue that has arisen in numerous jurisdictions.  California as a state quite often, and other jurisdictions within California, have addressed it.

> "So while it is a departure from the CALCRIM instruction, with this Court finding that the explanation in CALCRIM, specifically 520, is inadequate when instructing this jury about proximate cause and cause in fact to a circumstance specifically to this case, this Court has been guided by People vs. Brady, found at 129 Cal.App.4th 1314, which is a 2005 case, and in that case, while this Court's not going to review the facts with counsel since both counsel are familiar with the fact pattern in that case, in that case the trial court did instruct the jurors with an instruction that has been reviewed on appeal and has, more importantly, been affirmed on appeal, finding that the instruction provided in that case did adequately instruct the jurors on the applicable law in this area given a fact pattern that while it is not necessarily similar to this case, it is similar enough as it relates to proximate cause and cause in fact.  This Court is far more

---

[16] *People v. Watson*, *supra*, 30 Cal.3d 290.

comfortable with providing law to this jury that has been tested, reviewed, and, most importantly, affirmed in properly instructing the jurors about the law in a particular area that is a factual issue in dispute.

"Additionally, it does not appear to this Court, based on a recitation of the special instruction that is going to be given, that it precludes counsel from being able to articulate and argue their respective positions regarding this factual issue that the jury is going to have to decide when applying the facts to the law as this Court will instruct.

"It does not lend an advantage to one side over the other, but rather it adequately explains the area of law in this area as it relates to a fact that's been presented to this jury by way of the evidence since, as this Court stated previously, this is not a unique situation, it is one that is seen less often in our courtrooms involving this type of implied malice.

"For those reasons and over the defense's objection, the Court is going to give the redacted [CALCRIM No.] 520 instruction that has been previously provided to counsel, in addition to the redacted [CALCRIM No.] 620A instruction that is entitled Causation: Special Issues. It is that instruction that this Court finds is appropriate in this case and will adequately instruct these jurors as to the legal issues surrounding proximate cause and cause in fact." (Italics added.)

## G. *The Causation Instruction*

As set forth in the procedural summary, the court gave CALCRIM No. 520 on the elements of murder and implied malice and did not read the final two paragraphs as quoted in part II.B., *ante*.

Based on its instructional ruling, the court gave the following special instruction on causation, identified as CALCRIM No. 620A.[17] As we will explain below, the

_____

[17] CALCRIM No. 620 addresses special issues in causation, and the pattern instruction states in part:

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. [¶] … The failure of [decedent] or another person to use reasonable care may have contributed to the death. But if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death even though [decedent] or another person may have failed to use reasonable care…."

29.

entirety of the modified instruction was identical to the language in CALJIC instructions, and instructions given in *Brady, supra,* 129 Cal.App.4th at page1327, and *Schmies, supra,* 44 Cal.App.4th at page 50, footnote 7.

"The criminal law has its own particular way of defining cause. A cause of death or great bodily injury is an act or acts that sets in motion a chain of events that produces as a direct, natural, and probable consequence of the act or acts the death or great bodily injury and without which the death or great bodily injury would not occur.[18]

"For the purposes of determining causation, a direct, natural, and probable consequence is a consequence which is normal and is a reasonably foreseeable result of the original act. The consequence need not have been a strong probability. A possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen. It is enough if the possibility of some harm of the kind which resulted from the act was foreseeable.[19]

"There may be more than one cause of the death of David Nelson. When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct is also a substantial factor contributing to the result. A cause is concurrent if it is operative at the moment of the death and acted with another cause to produce the death.[20]

"If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person, even the deceased person, contributed to the death.[21]

"An intervening act may be so disconnected and unforeseeable as to be a superseding cause that, in such a case, the defendant's act will be regarded at law as not being a cause of the injuries sustained.

---

[18] The first paragraph is identical to CALJIC No. 3.40 on causation.

[19] The second paragraph is similar to language from *Cervantes, supra,* 26 Cal.4th 860, 871.

[20] The third paragraph is identical to CALJIC No. 3.41 and similar to the first paragraph of CALCRIM No. 620.

[21] The fourth paragraph is identical to CALJIC No. 3.41.

"It is not a defense to a criminal charge that the deceased or some other person was guilty of negligence, which was a contributory cause of the death involved in the case."[22]

### H.    *Causation Instructions in Vehicular Homicide Cases*

The trial court's decision to give the modified causation instruction was based on a series of homicide cases that addressed causation where the defendant did not directly crash into the decedent. In *People v. Harris* (1975) 52 Cal.App.3d 419 (*Harris*), officers pursued the defendant on a highspeed chase, during which a police car hit a civilian's vehicle resulting in the passenger's death. The defendant was charged with vehicular manslaughter, but the trial court set aside the information and found the defendant's conduct was not the proximate cause of the victim's death since the victim's car was hit by a police officer. (*Id.* at pp. 421–425.)

*Harris* disagreed with the trial court's finding on causation because "[the] defendant initiated an unlawful and reckless course of speed on public streets and then continued it for 4.4 miles in an effort to evade law enforcement officers who, using emergency sirens and red lights, tried to apprehend him…. His speed at times exceeded 100 miles per hour. It was reasonably foreseeable that the officers would continue to chase him as he speeded recklessly and circuitously over public thoroughfares and failed to stop at boulevard stops, thus setting in motion circumstances creating peril to others on the public streets and a high probability that collisions, injuries and deaths would occur in the course of the chase." (*Harris*, *supra*, 52 Cal.App.3d at p. 427.)

In *People v. Pike* (1988) 197 Cal.App.3d 732 (*Pike*), an officer was killed when he collided with another officer during a highspeed pursuit of the defendant. (*Id.* at pp. 735–739.) The defendant was convicted of vehicular manslaughter, and argued his conduct was not the proximate cause of the officer's death since he was not involved in the fatal collision. (*Id.* at p. 748.) *Pike* rejected this claim:

---

[22] The sixth paragraph is identical to CALJIC No. 8.56 on homicide, negligence of deceased or third person.

31.

"[The] [d]efendant's grossly negligent acts consisted of his seeking to elude the pursuing law enforcement officers by charging through traffic at extremely high speeds. Had defendant stopped as he should have, the accident would not have occurred. Instead, his persistent attempt to escape brought about just what would be expected: pursuit by more officers. The speeds, places, conditions and methods of driving were primarily dictated by defendant; he chose the route and speeds. Predictably, the officers chose to follow suit, keep him in view and apprehend him when he stopped or was stopped. The probability that this might result in one or both of the officers losing control and/or colliding with another vehicle or some object is sufficient to establish that defendant's conduct was a cause that, in natural and continuous sequence, produced [the victim's] death and without which that death would not have occurred. [Citations.]" (*Id.* at pp. 749–750.)

In *Schmies*, *supra*, 44 Cal.App.4th 38, officers from the California Highway Patrol (CHP) pursued the defendant. One CHP vehicle collided with a civilian's vehicle, and the driver died. The defendant was found not guilty of second degree murder but convicted of vehicular manslaughter with gross negligence. (*Id*. at p 43.) On appeal, the defendant argued the trial court improperly excluded evidence relating to the reasonableness of the officers' conduct during the pursuit and whether they violated CHP policies about how to conduct highspeed pursuits, and the error was prejudicial because the evidence would have shown the officers' failure to comply with those policies broke the chain of causation and absolved the defendant of responsibility for the driver's death. (*Id*. at pp. 45–46.)

*Schmies* extensively addressed causation and intervening and superseding causes, consistent with the principles set forth above, and explained that the question whether the defendant's acts caused the driver's death was to be "determined by the trier of fact according to these general principles governing proximate causation. [Citations.]" (*Schmies, supra*, 44 Cal.App.4th at p. 50.)

After summarizing these principles, *Schmies* cited to the causation instruction given to the jury in that case, which is identical to the instruction the trial court gave in

32.

the instant case. (*Schmies, supra*, 44 Cal.App.4th at p. 50, fn. 7.) *Schmies* relied on *Harris* and *Pike* and concluded the jury was properly instructed:

> "As a result of defendant's conduct and the officers' response, a vehicle collision occurred in which a third party was killed and one of the officers was injured. The question whether defendant's conduct is legally responsible for the death and injury depends upon whether the officers' conduct can be regarded as a superseding cause. That issue depends upon whether the danger was reasonably foreseeable to defendant rather than upon the reasonableness of the officers' response. The court made that distinction, explained it carefully in its ruling, and repeatedly advised that evidence and argument with respect to reasonable foreseeability would not be excluded. The defense pointed to no specific relevant evidence that it was dissuaded from presenting by the court's ruling. The jury was expressly instructed that 'an intervening act may be so disconnected and unforeseeable as to be a superseding cause,' absolving defendant of liability. The jury simply rejected this claim. There is no cause for reversal on this record." (*Schmies*, at p. 58.)

In *Brady, supra,* 129 Cal.App.4th 1314, a fire started in a wooded area near a methamphetamine laboratory that the defendant and his associate operated. As part of the extensive firefighting efforts, two pilots flew into the area to drop fire retardant, and they collided in the air and died. The defendant was convicted of recklessly starting a fire that caused the death of the pilots. On appeal, he argued the instructions precluded the jury from properly determining whether his conduct in starting the fire proximately caused the death of the two pilots, and asserted the pilots' failure to observe certain flight patterns were superseding intervening acts that absolved him of responsibility for their deaths. (*Id.* at pp. 1318–1323.)

*Brady* relied on *Schmies* and reviewed the principles of proximate cause and intervening and superseding causes. (*Brady, supra*, 129 Cal.App.4th at pp. 1324–1327.) In reviewing these principles, *Brady* set forth the entirety of the causation instruction given in that case, which identical to the causation instruction given in *Schmies* and by the trial court in the instant case. (*Id.* at pp. 1327–1328.)

33.

*Brady* explained the causation instruction given in the case was based on CALJIC Nos. 3.40, 3.41, and 8.56, and the holding in *Schmies*. (*Brady, supra*, 129 Cal.App.4th at pp. 1327–1328.) *Brady* explained "[t]here is no CALJIC instruction on superseding cause, so that the trial court was compelled to look elsewhere and utilized substantially the same instructions that were used and approved in *Schmies ....*" (*Id*. at p. 1328.) *Brady* noted the civil BAJI instructions provided more clarity on causation but found the CALJIC instructions had been approved as correct statements of the law. *Brady* concluded "[t]he instructions *as a whole* properly focused on whether the deaths of the two firefighters were reasonably foreseeable consequences of recklessly setting the fire in the woods." (*Id*. at p. 1329, italics added.)

## I.     *Instructional Review*

In reviewing a claim of instructional error, we "must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record. [Citations.]" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citations.]" (*People v. Sanchez*, *supra*, 26 Cal.4th at p. 852.)

" '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] ' "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' [Citation.]" (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

"There is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial. As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error." (*People v. Dieguez, supra,* 89 Cal.App.4th at

p. 277; *People v. Noguera* (1992) 4 Cal.4th 599, 648.)  We review claims of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

J.      *Analysis*

The jury in this case was given a causation instruction that was identical to instructions that had been approved in *Brady* and *Schmies* and consisted of CALJIC instructions that have been found legally correct.  The trial court was concerned about the accuracy of the causation language in CALCRIM No. 520 since defendant did not directly collide with or crash into Officer Nelson's car.  The court thus decided to give a causation instruction that had been given and approved in cases with similar facts.

Defendant argues that *Brady* never approved the causation instructions given in that case, and only approved particular language on intervening causes.  However, *Brady* held "[t]he instructions *as a whole* properly focused on whether the deaths of the two firefighters were reasonably foreseeable consequences of recklessly setting the fire in the woods."  (*Brady, supra*, 129 Cal.App.4th at p. 1329, italics added.)

Defendant complains the court committed prejudicial error simply because it gave an instruction based on the older CALJIC pattern instructions instead of the updated CALCRIM instructions.  This argument is meritless.  "The mere fact that [a particular] sentence is in CALCRIM does not make it legally correct.  '[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent.'  [Citation.]"  *(People v. Smith* (2014) 60 Cal.4th 603, 614.) An instruction "should not be cited as authority for legal principles in appellate opinions. At most, when they are accurate, … they restate the law."  (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

In *People v. Cornejo* (2016) 3 Cal.App.5th 36 (*Cornejo*), the court addressed an instructional situation similar to the instant case.  As in this case, the trial court in *Cornejo* gave CALCRIM No. 520 on second degree murder and implied malice but omitted the final two paragraphs on causation and instead gave CALJIC No. 3.41.  The

defendants argued the court committed prejudicial error and violated their constitutional rights by giving the previous CALJIC instructions on causation and asserted they had been superseded by the CALCRIM instructions. (*Cornejo,* at pp. 42, 59-60.)

*Cornejo* rejected the defendants' arguments that legally correct CALJIC instructions became invalid after the adoption of the CALCRIM instructions:

> " 'The California Judicial Council withdrew its endorsement of the long-used CALJIC instructions and adopted the new CALCRIM instructions, effective January 1, 2006.' [Citation.] California Rules of Court, rule 2.1050(e) provides: 'Use of the Judicial Council instructions is strongly encouraged. If the latest edition of the jury instructions approved by the Judicial Council contains an instruction applicable to a case and the trial judge determines that the jury should be instructed on the subject, it is recommended that the judge use the Judicial Council instruction unless he or she finds that a different instruction would more accurately state the law and be understood by jurors.' However, as our Supreme Court has explained, 'a trial court's failure to give the *standard* … instruction does not necessarily constitute state law error,' and while 'use of the standard instruction … is preferred, it is not mandatory.' [Citation.] Nor does the trial court's failure to use the standard instruction 'amount to state law error when its substance is covered in other instructions given by the court.' [Citation.]
>
> " 'CALJIC instructions that were legally correct and adequate on December 31, 2005, did not become invalid statements of the law on January 1, 2006. Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors. The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as superior. No statute, rule of court, or case mandates the use of CALCRIM instructions to the exclusion of other valid instructions.' [Citation.]" (*Cornejo, supra*, 3 Cal.App.5th at pp. 60-61.)

As for the instructions that were given, *Cornejo* held the substance of some of the omitted language from CALCRIM No. 520 was addressed in CALJIC No. 3.41. (*Cornejo, supra*, 3 Cal.App.5th at p. 60.) *Cornejo* found the trial court should have also given CALJIC No. 3.40 to completely address causation, but held the error was not prejudicial based on the entirety of the instructions and evidence. (*Id*. at pp. 61-62.)

In this case, the trial court gave a causation instruction that included both CALJIC Nos. 3.40 and 3.41, in addition to language that has been approved as legally correct. (*People v. Jennings* (2010) 50 Cal.4th 616, 670 [CALJIC Nos. 3.40, 3.41]; *People v. Bland* (2002) 28 Cal.4th 313, 334–335, 338 [CALJIC Nos. 3.40, 3.41]; *People v. Cervantes, supra,* 26 Cal.4th at pp. 866, 874 [CALJIC No. 3.40]; *People v. Fiu* (2008) 165 Cal.App.4th 360, 372 [CALJIC No. 3.40]; *Brady, supra*, 129 Cal.App.4th at pp. 1327–1329; *Schmies, supra*, 44 Cal.App.4th at pp. 58, 50, fn. 7; *Pike, supra,* 197 Cal.App.3d at p. 748 [CALJIC No. 8.56].)

Defendant contends the court never instructed the jury on the definition of natural and probable consequences since it deleted the relevant paragraphs in the pattern version of CALCRIM No. 520. However, the court also gave CALCRIM No. 403 on aiding and abetting[23] that defined the phrase natural and probable consequences as it related to the charge of second degree murder as follows: "*A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.*"[24] The entirety of the instructions thus contained the definition of natural and probable consequence in language identical to that omitted from CALCRIM No. 520. (See, e.g., *People v. Canizalez* (2011) 197 Cal.App.4th 832, 849.)

Finally, defendant argues the trial court's causation instruction omitted CALCRIM No. 520's mandatory language that defendant's conduct had to be a "substantial factor" in causing the death. However, the special causation instruction in CALCRIM No. 620A stated: "There may be more than one cause of the death of David Nelson. When the

---

[23] The court may have instructed on aiding and abetting on the theory that another person was in the car during the pursuit. In closing argument, defense counsel referred to this instruction and the "natural and probable consequences" language contained therein.

[24] The italicized language is also identical to that contained in CALCRIM No. 240 on causation.

conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct is also *a substantial factor* contributing to the result. A cause is concurrent if it is operative at the moment of the death and acted with another cause to produce the death." (Italics added.) We conclude the jury was correctly instructed on causation.

## III. Implied Malice

As explained in issue II, *ante*, the pattern version of CALCRIM No. 520 contained causation language, but the court omitted those paragraphs and instead granted the People's motion to instead give a special causation instruction identified as CALCRIM No. 620A.

Defendant argues that as a result of the trial court's omission of these paragraphs, the jury was not fully and correctly instructed on the definition of implied malice. Defendant argues the omission was prejudicial because the jurors were "left to fend for themselves" to determine if the facts established implied malice, and the jury could have found implied malice by incorrectly assuming the death "was merely foreseeable, or could be imagined, or might happen, or was a possible occurrence."

### A. *CALCRIM No. 520*

As relevant to defendant's argument on this particular issue, the court omitted the following paragraph from CALCRIM No. 520.

> "… An act … causes death if the death is the direct, natural, and probable consequence of the … act … and the death would not have happened without the … act …. *A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes*. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." (Italics added.)[25]

---

[25] While defendant extensively addressed the instruction on causation, he did not object to the trial court's decision to omit this phrase from CALCRIM No. 520. Defendant asserts he did not forfeit this issue because the court's alleged failure to instruct on natural and probable consequences violated his substantial rights. We thus

**B.** *Analysis*

Defendant argues that just as the trial court failed to define "natural and probable consequences for purposes of defining causation" as addressed in issue II, *ante*, the failure to define the phrase was prejudicial as to the jury's determination of implied malice, and the error was not cured by CALCRIM No. 620A, the special causation instruction. As already noted, however, the jury received the definition of the phrase in CALCRIM No. 403. The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole. (*People v. Castillo, supra,* 16 Cal.4th at p. 1016.) The entirety of the instructions thus contained the definition of natural and probable consequence in language identical to that omitted from CALCRIM No. 520.

Defendant next argues that the jury had to be instructed that implied malice is shown " 'when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves *a high degree of probability* that it will result in death…." ' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 88, italics added.) Defendant asserts that the omission of the phrase " ' "a high degree of probability" ' " from the definitional language resulted in a reduction of the prosecution's burden of proof.

The California Supreme Court has explained that the concept of implied malice can be defined in two ways. (*Watson, supra,* 30 Cal.3d at p. 300.) "[S]econd degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " ….' [Citation.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will

_____

address the merits of his instructional claim. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708.)

39.

result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" (*Ibid*.)

It is, thus, "abundantly clear that the two definitions of implied malice … articulate[] one and the same standard." (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1218–1219.) The two phrases are "alternative definitions for the same concept" and "can be viewed as synonymous - i.e., an act for which the natural consequences are dangerous to human life by its nature involves a high probability of death." (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 378–379.)

In *Nieto Benitez, supra,* 4 Cal.4th 91, the trial court instructed the jury with CALJIC No. 8.31 on the elements of implied malice as follows: " 'Murder of the second degree is the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. *The natural consequences of the act are dangerous to human life*, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.' " (*Nieto Benitez, supra*, 4 Cal.4th at p. 100, italics added.)

*Nieto Benitez* addressed the defendant's argument that the implied malice instruction was faulty because it did not state "a requirement that [the] defendant commit the act with a *high probability* that death will result. [Citation.]" (*Nieto Benitez, supra*, 4 Cal.4th at p. 111.) *Nieto Benitez* relied on *Watson* and held the instruction was legally correct and "correctly distills the applicable case law. [Citations.]" (*Nieto Benitez, supra*, at p. 111) "[W]e indicated in … *Watson* that the two linguistic formulations – 'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard. [Citations.] Accordingly, we find no error in the trial court's use of CALJIC No. 8.31…." (*Ibid*.)

40.

In this case, the jury was given the same definition of implied malice in CALCRIM No. 520 that was approved in *Nieto Benitez*: "The defendant acted with implied malice if: [¶] One, he intentionally committed an act; [¶] Two, the natural and probable consequences of the act were dangerous to human life; [¶] Three, at the time he acted, he knew his act was dangerous to human life; [¶] And, four, he deliberately acted with conscious disregard for human life." As in *Nieto Benitez*, the jury was correctly instructed on the definition of implied malice.[26]

## IV.    Due process and the Instructions

Defendant contends that his due process rights were violated by the alleged erroneous instructions on causation and implied malice, and the prosecutor's argument purportedly exacerbated the error since he relied on the instructional language to assert defendant was guilty. Having found the court correctly instructed the jury, we similarly reject defendant's due process arguments.

## V.    Exclusion of Evidence of the Victim's Alleged Negligence

Defendant next argues the court improperly excluded evidence that Officer Nelson was not wearing his seatbelt at the time of the fatal collision. Defendant asserts the court's evidentiary ruling prevented him from presenting a defense to the elements of causation and implied malice, because Nelson's failure to use his seatbelt may have caused his death and absolved defendant from criminal culpability for second degree murder.

### A.    *Background*

The People's trial brief moved to exclude all evidence of the reasonableness of Officer Nelson's conduct during the pursuit, including possible negligence during the

---

[26] In his reply brief, defendant concedes *Watson* held the two definitions of implied malice articulated the same standard, and acknowledges his arguments are contrary to *Nieto Benitez*. However, he argues the California Supreme Court's decision was incorrect. We agree with *Watson* and *Nieto Benitez* and are compelled to follow the ruling. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

pursuit and his failure to wear a seat belt, because the victim's contributory negligence was not an excuse or defense to a defendant's criminal conduct.

Defense counsel objected and argued the evidence was relevant to defendant's knowledge and intent, and his ability to "make assumptions about a trained officer and how he would react and what he would do. And in terms of driving that he's been trained for these kinds of things and would therefore proceed under the sense of that training. So I think it goes to more than just, you know, as a defense it goes to his state of mind that we were talking about earlier when we were talking about implied malice."

Defense counsel argued defendant would expect a patrol officer would have been trained in the proper operation of his vehicle in emergency situations, and "the fact that [Officer Nelson was] not wearing a seatbelt is important, okay, because that goes to his training and his skillful operation of the vehicle." "When people, laymen, civilians, whatever, get into a car, … it's pounded into our heads that you have to have a seatbelt and you have to wear it and if you get caught without it you get a ticket. I think that the fact that this officer chose not to … wear his seatbelt goes to his skillfulness and aptitude to carry out his duties as an officer."

### B.     *The Court's Ruling*

The trial court granted the prosecution's motion to exclude this evidence:

"[C]ontributory negligence used to be the state of the law in California in the criminal arena, but that was done away with a number of years ago. And to argue and present evidence based on that argument of contributory negligence would be unlawful as it is no longer a potential defense in a criminal case.

"In a civil case, however, certainly contributory negligence is an appropriate vehicle when determining fault and just as importantly liability. But this is not a civil case. It might be one in the civil arena where those areas would be relevant, but it is not relevant and has no place in this trial."

The court acknowledged defense counsel's argument that defendant might have had a reasonable expectation about the officer's conduct and driving skills.

"But in any event this Court's preclusion of the contributory negligence arguments and evidence directly related to Officer Nelson - and as a side note, this Court's not taking a position that Officer Nelson was negligence, just based on the arguments of counsel is the Court using that particular verbiage.

"In any event, I do not believe that they would preclude [defense counsel] from presenting what your client expected and so forth. You can do that without getting into Officer Nelson, specifically, including whether or not Officer Nelson was wearing a seatbelt, his aptitude or skillfulness in vehicle operations, the policies and procedures of the law enforcement agency. [¶] None of that specifically is relevant in this case since it goes to contributory negligence and nothing else."

The court thus excluded any evidence of Officer Nelson's alleged contributory negligence.

## C. *Contributory Negligence*

"[A] defendant whose conduct was a proximate cause of harm is not absolved of responsibility because another person's conduct, negligent or otherwise, is also a substantial or contributing factor in causing the harm." (*Brady, supra*, 129 Cal.App.4th at p. 1328.) "In criminal prosecutions, the contributing negligence of the victim or a third party does not relieve the criminal actor of liability, unless the victim's or third party's conduct was the *sole* or *superseding* cause of the death. [Citations.]" (*People v. Autry* (1995) 37 Cal.App.4th 351, 360 (*Autry*).)

" ' "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." [Citations.] Thus, it is only an unforeseeable intervening cause, *an extraordinary and abnormal occurrence*, which rises to the level of an exonerating, superseding cause.' [Citation.]" (*People v. Morse* (1992) 2 Cal.App.4th 620, 639; *Brady, supra*, 129 Cal.App.4th at pp. 1335–1336; *Schmies, supra*, 44 Cal.App.4th at pp. 55–58.) Moreover, "[a]n 'intervening' or 'superseding' cause which relieves the criminal actor of

43.

responsibility is one which 'breaks the chain of causation' *after* the defendant's *original* act," and defendant's act is no longer a substantial factor in producing the injury. (*Autry, supra*, 37 Cal.App.4th at p. 361; *Wattier, supra,* 51 Cal.App.4th at p. 953.)

In *Schmies, supra*, 44 Cal.App.4th 38, the trial court excluded evidence about whether CHP officers complied with department policy during a highspeed pursuit of the defendant where a CHP car hit a civilian car and a passenger died. *Schmies* held the evidence was properly excluded because "whether the officers violated the CHP pursuit guidelines is immaterial. The question is whether [the] defendant realized or should have realized that the CHP officers would pursue his fleeing motorcycle. In this case, the evidence clearly shows that [the] defendant knew, or at the very least, should have known that his flight would cause the officers to pursue him. This is true if for no other reason than the officers were in fact pursuing him and he nevertheless continued to flee. This illegal and dangerous act by defendant caused the officers to pursue him and ultimately caused the fatal accident. *It adds not one whit to say that the officers violated the CHP pursuit guidelines. The test, as we have recounted, is not whether the officers acted reasonably but rather whether defendant realized or should have realized that the officers would respond as they did*…." (*Id*. at p. 55, italics added, fn. omitted; see also *Pike, supra,* 197 Cal.App.3d at pp. 747–748; *Autry, supra,* 37 Cal.App.4th at pp. 355–361.)

### D.     *Analysis*

We review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. (*People v. Kopatz* (2015) 61 Cal.4th 62, 85; *People v. DeHoyos* (2013) 57 Cal.4th 79, 131.)

Defendant argues the court abused its discretion by excluding any evidence of Officer Nelson's negligence in failing to wear his seatbelt during the pursuit. As a matter of law, however, the victim's preexisting failure to use a safety device which might have prevented the effects of defendant's act cannot be an intervening or superseding cause.

(*Autry, supra*, 37 Cal.App.4th at p. 361; *Wattier, supra,* 51 Cal.App.4th at p. 953.) A failure to use a safety device cannot be characterized as an intervening force or act, but rather is an *absence* of a force or act to break the chain of causation. (*Wattier, supra,* 51 Cal.App.4th at p. 953.) Accordingly, a defendant cannot complain if the victim fails to use a safety device to serve as an intervening force to prevent the natural consequences of the defendant's criminal act. (*Autry, supra,* 37 Cal.App.4th at p. 361.)

In *Wattier*, the defendant was recklessly driving and triggered a collision with another car that killed a child. The defendant argued the trial court improperly excluded evidence that the child had not been wearing a seatbelt because it was relevant to show the child would not have died if he had been wearing the seatbelt. (*Wattier, supra*, 51 Cal.App.4th at p. 952.) *Wattier* held the court properly excluded the evidence:

> "Essentially, the defense attempts to inject concepts of causation from archaic civil law into the modern criminal law in order to get off scot-free. Relying on the theory of contributory negligence – a former defense in civil negligence actions – he desires to eliminate his responsibility for the harm that he caused, simply because the victim was not a perfect citizen. Prior to the decision in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, … the contributory negligence of a plaintiff was a *complete* defense in a civil negligence action. [Citation.] But that defense was predicated on the theory that between two parties who *both* exhibited less than reasonable care, one party should not have to pay the other for injury or damages caused by them both. On the other hand, even under contributory negligence, the defendant who *willfully* committed an act resulting in the harm to the plaintiff, could not call upon the victim's contributory negligence to eliminate his responsibility. [Citation.]
>
> "The criminal law, however, *presupposes* mens rea - or a 'guilty mind' - on the part of the defendant before his or her action can be considered criminal. [Citation.] [The defendant] attempts to graft concepts of contributory negligence onto the criminal law without acknowledging the limitations imposed on the theory even in the civil arena.
>
> "In realistic terms, however, his desired revision must be rejected. A society cannot permit a defendant to escape responsibility for his or her criminal conduct simply because a victim was not 'sufficiently' cautious or perfect. Otherwise, the system would essentially grant a 'get-out-of-jail-free' card to any wrongdoer for having selected his victim judiciously. Do

45.

we really want to define burglary as a crime if the victim locks his or her doors, but not if little Herkemer left the back door unlatched? Or excuse the driver who 'hits and runs' another car, simply because the other car's driver has no proof of insurance on him or her at the time?

> "As the failure to use a seat belt was merely an absence of an intervening force which, at best, *might* have broken the chain of the natural and probable consequences of [the defendant's] conduct, it was irrelevant to the ultimate issue of his criminal responsibility…." (*Id*. at pp. 954–955, fn. omitted.)

As in *Wattier*, the trial court properly excluded evidence about whether Officer Nelson wore a seat belt because of his alleged contributory negligence was irrelevant and would not have relieved defendant of the consequences of his own conduct that caused Nelson's death.

Defendant separately argues the court's exclusion of evidence that Officer Nelson was not wearing a seat belt violated his constitutional right to present a defense and the error was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24.) Defendant's "attempt to inflate garden-variety evidentiary questions into constitutional ones is unpersuasive." (*People v. Boyette* (2002) 29 Cal.4th 381, 427.) " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain … a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citation.]' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) "It follows, for the most part, that the mere erroneous exercise of discretion under such 'normal' rules does not implicate the federal Constitution." (*Ibid*.) Indeed, "only evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.)

While the court excluded the seatbelt evidence, the jury still heard defendant's opinion about how Officer Nelson handled the pursuit through his statements in his letter, where he complained that Nelson was trained but the accident was his fault. The jury

also heard the testimony from the prosecutor's expert, who could not explain why Nelson made the turn in that particular manner.

Defense counsel addressed Officer Nelson's handling of his vehicle in closing argument, when he acknowledged the jury had been instructed that "whatever the victim may have done, you know, you can't blame him for the accident." However, counsel argued that Officer Nelson's patrol car crashed because of how he made the right turn. Defense counsel further argued the prosecution's expert could not explain why Nelson made the turn in that manner, and that raised a reasonable doubt about defendant's guilt because there could have been a superseding intervening cause that would absolve defendant of culpability. Defendant was not denied the right to present a defense.

## VI.     Admission of Evidence of Defendant's Prior Acts

Defendant next argues the court erroneously admitted evidence of his four prior traffic citations and the three prior incidents where he fled from the police. Defendant asserts this evidence constituted inadmissible character evidence in violation of Evidence Code[27] section 1101, subdivision (a), and was unduly prejudicial.

Defendant argues his speeding tickets did not have any probative value to show that he knew speeding was dangerous. Defendant further argues the police officers' prior foot pursuits were irrelevant since the instant case involved a traffic stop and a car chase. Defendant further argues the evidentiary error was prejudicial because the jury was never instructed with an instruction on the limited admissibility of this evidence.

### A.     *Background*

The People's trial brief moved to introduce evidence of defendant's prior traffic citations and previous incidents where he fled from the police. Defendant's trial brief requested an evidentiary hearing on all of the People's proposed section 1101,

---

[27] All statutory citations in issues VI and VII are to the Evidence Code unless otherwise indicated.

47.

subdivision (b) evidence, specifically the testimony of the law enforcement officers who were going to testify about their prior encounters with defendant.

At the hearing on the People's motion, the prosecutor argued an offer of proof should be sufficient instead of an evidentiary hearing. The court agreed.

The prosecutor stated that he intended to call the officers to testify about some of the prior incidents, while other incidents would instead be proved "by court docket, certified dockets."

### 1. Fleeing from the Police

In his offer of proof, the prosecutor said he intended to introduce testimony from officers about defendant's prior acts of fleeing from them in 2007, 2010, and 2012. The prosecutor's offer of proof was consistent with the evidence about these incidents introduced at trial, as set forth above in the factual statement.

The prosecutor also moved to introduce evidence about an incident where a California Highway Patrol officer pursued defendant in 1998, based on defendant's account in his post-arrest interview with Sergeant Moore; and an incident in 2014, where defendant resisted arrest, fought with police officers, and a Taser was used against him.

### 2. Prior Traffic Violations

As a separate matter, the prosecutor moved to introduce evidence about defendant's prior speeding citations in 2001, 2004, 2007, and 2010, consistent with the evidence introduced at trial as set forth in the factual statement above.

The prosecutor also moved to introduce evidence about two other traffic violations: in September 2011, defendant was riding a motorcycle, he went off the road because he was speeding, and he was injured and taken to the hospital; and in July 2013, defendant was driving at a high rate of speed, hit a car that was stopped at a stoplight, and the other driver was injured.

### 3.    The Parties' Arguments

The prosecutor argued defendant's prior speeding violations and attempts to flee from the police were admissible under section 1101, subdivision (b) to establish his subjective knowledge and awareness of the risks required to prove implied malice for second degree murder:  he knew driving fast was dangerous, fleeing from the police was dangerous, and the police were likely to pursue him if he fled.  The prior incidents were "persuasive evidence that [defendant] [was] aware that if he runs from the police at a high rate of speed that something dangerous very well could happen, and it goes to the heart of, you know, the foreseeability of that for the defendant.  It was - it's generally foreseeable for most individuals that fleeing from the police at a high rate of speed is extremely dangerous.  But no one knows that better than [defendant] because he's done those things."

Defense counsel objected and argued the evidence only would be relevant to prove knowledge if the incidents happened during the actual pursuit on the night of the fatal collision instead of a few years earlier.  Counsel argued the prior incidents were unduly prejudicial under section 352 because they were too remote in time, involved running away on foot from officers and not being in a car, and the traffic citations did not involve high-speed pursuits by officers.  While defendant had "issues" with the police department, his personal feelings didn't prove implied malice.[28]

Defense counsel did not make a hearsay objection to any of the prior acts evidence, including the prosecutor's intent to introduce certified court dockets about certain incidents.

---

[28] As we will discuss in issue VII, *post*, defense counsel did not raise a hearsay objection to the prosecutor's offer of proof about defendant's prior traffic citations.

49.

**B.**      *The Court's Ruling*

The trial court held defendant's prior traffic violations and incidents where he fled from the police were admissible and relevant as to defendant's subjective knowledge for implied malice.

The court granted the prosecution's motion to introduce evidence about defendant's prior attempts to flee from officer in 1998, 2007, 2010, 2012, and 2014; and defendant's speeding citations in 2001, 2004, 2007, 2010, and 2013.

> "[T]he Court is going to grant the People's request to introduce this information for the following reasons and for the following bases. In an implied case where second degree murder is the only option in the case the Court does treat that Penal Code Section as partially general intent crime with a particular mental state requirement. If one were to look at the necessary elements and argue that the act committed was intentional, it is just that, it is an intentional act committed by the defendant with a necessary mental state.

> "What is at issue in this case is whether the defendant knew that vehicle pursuits are dangerous, that driving in that capacity is dangerous as well as whether the defendant knew that if the defendant fled from police that the police are likely to follow him. Those are necessary issues and evidence that the jury can consider in determining whether at the time the defendant acted he knew his act was dangerous to human life and that he deliberately acted with a conscious disregard for human life. Those are issues that this jury is going to have to litigate, and this is relevant information for them to consider in that process.

> "Under [section] 352 the Court has been considering the balancing test that is necessary for evidence such as this. And in doing so the Court recognizes the probative value of presenting such information as it directly relates to the impugning knowledge one can place on the defendant given his past conduct and past actions. And it is that knowledge specifically that this jury is going to have to consider when determining the dangerousness and whether the defendant knew and appreciated the dangerous conduct. For those reasons the Court is going to allow the People to introduce this information as it relates to knowledge of the defendant and not for propensity purposes. I trust counsel will not argue propensity purposes. I trust counsel will not argue propensity recognizing the limitations under which this evidence is being presented."

50.

The court reserved ruling on the admission of defendant's 2011 motorcycle injury/accident and asked the prosecutor to further address it. The prosecutor decided not to introduce that incident.

### C.    *Trial Evidence and Argument*

As set forth in the factual statement, Eric Light, the DMV investigator, testified about defendant's prior traffic citations for speeding in 2001, 2004, 2007, and 2010. Mr. Light also read the *Watson* warnings that were on the documents signed by defendant to obtain his license, that he could be charged with murder if he drove while intoxicated and caused a death. As for the prior incidents of fleeing from officers, three law enforcement officers testified about their encounters with defendant that occurred in 2007, 2010, and 2012, where he failed to obey their orders, fled, and resisted arrest.

The trial court also held an incident in 1998 where defendant was pursued by an officer was admissible. It appears that evidence of the prior incident was introduced based on Sergeant Moore's postarrest interview with defendant, when defendant compared Officer Nelson's pursuit with how fast he went when the police pursued him during an incident when he was younger.

As for the 2014 incident where defendant resisted arrest, fought with the police, and was hit with a Taser, defendant's handwritten letter referred to a prior incident when he fled from the police and a Taser was used against him.

The court also held defendant's 2013 citation for speeding was admissible, but the prosecution did not introduce evidence about that incident.

In closing argument, the prosecutor talked about defendant's prior acts in one brief section of his argument. The prosecutor distinguished between vehicular homicide cases resulting from driving under the influence compared to those that occurred during speeding or racing and focused on defendant's conduct in leading Officer Nelson on a high-speed chase. The prosecutor briefly mentioned defendant's prior conduct when he addressed implied malice: "[W]hen we're … talking about the things that show that

51.

[defendant] knew that what he was doing was dangerous, and I'd be talking about things that - you know, I'd start off by saying well, you know, everybody knows that it's dangerous, first of all, but he knew it, in particular, okay, 'cause he knew that officers were likely to follow him, okay, *because he had done this before.·* He knew that highspeeds were dangerous 'cause he'd been cited for it before.  And I'd talk about sort of the obvious things."  (Italics added.)

The prosecutor explained that defendant's conduct during the actual pursuit was sufficient evidence of implied malice, and "you almost don't even need to talk about things in his past that would have illustrated to him that this was dangerous.  You know why?  His conduct on that night was dangerous by design.  It was dangerous by design. He wanted it to be dangerous."

In his closing argument, defense counsel referred to defendant's prior acts for the opposite conclusion, and asserted the evidence showed defendant had "subjective knowledge … that if I run from the police, *I'm going to get hurt*, not that I'm going to cause harm to … human life other than my own."  (Italics added.)

## D. *Section 1101*

"[S]ection 1101, subdivision (a) generally prohibits the admission of evidence of a prior criminal act against a criminal defendant 'when offered to prove his or her conduct on a specified occasion.'  Subdivision (b) of that section, however, provides that such evidence is admissible when relevant to prove some fact in issue, such as motive, intent, knowledge, identity, or the existence of a common design or plan.  [¶]  'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.'  [Citation.]"  (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.)

"Evidence may be excluded under … section 352 if its probative value is 'substantially outweighed by the probability that its admission would create substantial

52.

danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.] 'Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value.' [Citation.]" (*People v. Lindberg, supra,* 45 Cal.4th at pp. 22–23.)

We review the trial court's rulings under sections 1101 and 352 for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.)

In *People v. Eagles* (1982) 133 Cal.App.3d 330, the defendant was convicted of second degree murder based on his reckless driving; he was not under the influence of alcohol or other intoxicants. *Eagles* held the trial court properly admitted evidence of the defendant's prior reckless driving as relevant to show his subjective knowledge for implied malice.

> "Here, the evidence of prior driving conduct was offered to prove an intermediate fact (knowledge that conduct is life threatening) necessary to the establishment of the ultimate fact of implied malice .... [¶] Evidence of excessive speed resulting in a near collision is relevant to knowledge of risk, 'an actual awareness of the great risk of harm' of excessive speed…. We agree with the prosecutor at trial that it is a permissible inference that '[w]hen you're driving around ... at a high rate of speed, almost cause an accident, you must see what the risk of harm is that can follow it.' What defendant knew in the afternoon he undoubtedly knew that night before the fatal accident. The evidence was admissible to prove implied malice." (*Id.* at p. 340.)

In *People v. Ortiz* (2003) 109 Cal.App.4th 104, 111 (*Ortiz*), the defendant was convicted of second degree murder for driving at a high rate of speed, crossing the center line, and crashing into another car. The trial court granted the prosecution's motion to introduce evidence of the defendant's prior acts of both reckless driving and drunk driving as relevant under section 1101, subdivision (b) to establish his "knowledge" of the subjective risks of his conduct to support the element of implied malice, even though he was not intoxicated when he committed the charged offense. (*Ortiz*, at pp. 110, 111–112.)

53.

*Ortiz* held the evidence of the defendant's prior acts was relevant and admissible under section 1101, subdivision (b), as to whether defendant had the subjective knowledge required for implied malice. The prior drunk driving incidents were admissible even though he was not intoxicated at the time of the fatal collision. (*Ortiz, supra*, 109 Cal.App.4th at pp. 113–115.) "[A] motor vehicle driver's previous encounters with the consequences of recklessness on the highway - whether provoked by the use of alcohol, of another intoxicant, by rage, or some other motivator - sensitizes him to the dangerousness of such life-threatening conduct." (*Id.* at p. 112.) "A jury is entitled to infer that regardless of the mental state or condition that accompanies an instance of reckless driving - whether intoxication, rage, or wilful irresponsibility – the driver's subsequent apprehension and prosecution for the conduct must impart a knowledge and understanding of the personal and social consequences of such behavior." (*Id.* at p. 115.)

*Ortiz* further held the evidence was highly probative under section 352 because " 'when a person repeatedly violates the law while driving a motor vehicle, and is repeatedly apprehended for those offenses, and convicted of those offenses, and presumably becomes more and more aware of the danger of that activity as time goes by, that that evidence can support a finding of implied malice.' " (*Ortiz, supra,* 109 Cal.App.4th at p. 118.) *Ortiz* concluded any prejudicial effect was minimal because the prior acts were less inflammatory than the charged offense, and the court instructed the jury to consider the evidence for only a limited purpose. (*Id.* at pp. 118-119.)

E. *Analysis*

As in *Ortiz* and *Eagles*, the trial court did not abuse its discretion when it introduced evidence of defendant's prior traffic violations and prior acts of fleeing from officers. Both types of evidence were relevant to establish defendant's subjective knowledge that the police would pursue him if he drove at high rates of speed, and if he failed to stop when ordered.

Defendant argues the prior acts evidence was unduly prejudicial because the DMV's investigator read the printed *Watson* warnings that defendant received on certain documents, that he could be charged with murder if he drove under the influence of alcohol and/or drugs and caused a death. Defendant asserts such language was completely irrelevant to this case since the prior incidents involved speeding tickets, he was not intoxicated during those situations, and he was not intoxicated during the charged offense.

The evidence was not unduly prejudicial. The prosecution never inferred or asserted that defendant was intoxicated on the night of the highspeed chase. Second, the evidence of defendant's prior traffic citations and fleeing from the police "was no stronger and no more inflammatory than the testimony concerning the charged offenses. This circumstance decreased the potential for prejudice, because it was unlikely … that the jury's passions were inflamed by the evidence of defendant's uncharged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

Defendant further argues the court's allegedly evidentiary error was prejudicial because it failed to instruct the jury with CALCRIM No. 375 on the limited purpose for the admission of prior acts evidence. Defendant speculates the court's failure to give the instruction "may have been a tacit recognition that there was, in fact, no legitimate purpose for this evidence." However, the trial court did not have a sua sponte duty to give CALCRIM No. 375 on the limited admissibility of the prior acts evidence in the absence of a request. (*People v. Maury* (2003) 30 Cal.4th 342, 397, fn. 11; *People v. Collie* (1981) 30 Cal.3d 43, 63-64.) "There may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence." (*People v. Collie, supra*, 30 Cal.3d at p. 64.)

This is not the extraordinary case anticipated by *Collie*. There was overwhelming direct evidence of defendant's implied malice based on his postarrest statements and the very nature of the highspeed pursuit that occurred in this case. In addition, the prosecutor only referred to the prior acts evidence in a brief portion of his closing argument, and said the evidence was relevant to show defendant knew that the police would follow him if he fled, but immediately followed that comment by asking the jury to again focus on defendant's conduct on the night of the fatal collision, and argued his refusal to stop even though he knew that an officer was pursuing him showed defendant had the requisite subjective knowledge during the highspeed chase.

## VII. Hearsay Arguments About Defendant's Prior Traffic Citations

Defendant raises a separate argument about the admissibility of his prior speeding tickets and raises two hearsay claims. First, he argues the testimony of Eric Light constituted inadmissible hearsay that did not satisfy any statutory exception. Second, he argues evidence about his prior citations was inadmissible testimonial hearsay admitted in violation of his constitutional rights as set forth in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

As we will explain, however, defendant failed to raise a statutory hearsay objection and has forfeited his statutory claim, and Mr. Light's testimony did not violate *Crawford*.

### A. *Background*

As set forth above, the court held a hearing about the prosecution's motion to admit evidence of defendant's prior acts and defendant's objections. The prosecutor gave an extensive offer of proof as to both the prior acts of fleeing from the police and the prior traffic citations. Defense counsel objected and argued the evidence was inadmissible character evidence in violation of section 1101, subdivision (a), and unduly prejudicial under section 352.

Defense counsel never argued that the prior acts evidence was inadmissible hearsay or that a statutory hearsay exception was not applicable.

The court held the evidence was admissible and relevant to defendant's knowledge to establish implied malice and was not prejudicial.

Also as set forth above, the prosecution introduced this evidence at trial by calling Mr. Light to testify about defendant's prior speeding citations. In response to the prosecutor's questions, Mr. Light read each citation that defendant had received, as summarized in the factual statement above. Mr. Light did not offer any opinions about defendant's conduct during these prior incidents and simply read from the DMV's computerized records of his driving history. The officers who issued the citations did not testify about the prior incidents. Defense counsel did not raise a hearsay objection to Mr. Light's trial testimony.

## B.      *Failure to Make Statutory Hearsay Objection*

Defendant argues Mr. Light's trial testimony contained two levels of inadmissible hearsay. He further argues the prosecution, as proponent of Mr. Light's trial testimony, had the burden to prove statutory hearsay exceptions existed for both levels but failed to do so. Defendant argues that the evidence might have been admissible under a hearsay exception if the traffic citations resulted in convictions, but the prosecution failed to introduce any evidence on that point. Defendant thus concludes that "[n]o hearsay exception was shown to apply" and the trial court's admission of Mr. Light's testimony about the prior traffic citations was prejudicial error pursuant to *People v. Watson* (1956) 46 Cal.2d 818.

### 1.      Forfeiture

Defendant's argument is flawed because he never raised a hearsay objection to this evidence during either the prosecutor's offer of proof or when Mr. Light testified at trial. "Generally, a timely objection is required for reversal of a judgment on the merits on an alleged erroneous admission of the evidence. [Citation.]" (*People v. Stevens* (2015) 62

57.

Cal.4th 325, 334.)  The failure to make a hearsay objection similarly forfeits appellate review of the issue.  (§ 353, subd. (a); *People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Barnett* (1998) 17 Cal.4th 1044, 1120-1121; *People v. Garceau* (1993) 6 Cal.4th 140, 179, abrogated on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117.)

A defendant "ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed him or herself of the opportunity to bring them to that court's attention.  [Citation.]" (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 655; *People v. Panah* (2005) 35 Cal.4th 395, 476.)  The defendant is required to object to preserve an evidentiary contention in criminal cases "because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' [Citation.] 'The reason for the requirement is manifest:  a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.]" (*People v. Partida* (2005) 37 Cal.4th 428, 434.)

Defendant's failure to raise a hearsay objection to Mr. Light's testimony has forfeited appellate review of this evidentiary issue.  Mr. Light's testimony about defendant's prior traffic citations was based on the DMV's computerized records of his driving history.  If defendant had raised a hearsay objection, the prosecution would have likely asserted the evidence was admissible under the official records exception pursuant to section 1280:

> "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a

public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

"Whether the trustworthiness requirement has been met is a matter within the trial court's discretion. [Citation.]" (*People v. Parker* (1992) 8 Cal.App.4th 110, 116.) Section 1280 " 'permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness.' [Citation.] 'In addition to taking judicial notice, a court may rely on the rebuttable presumption that official duty has been regularly performed (… § 664) as a basis for finding that the foundational requirements of … section 1280 are met.' [Citation.]" (*People v. George* (1994) 30 Cal.App.4th 262, 274; *People v. Dunlap* (1993) 18 Cal.App.4th 1468, 1477, italics added in original.)

In this case, the prosecution was not required to introduce foundational evidence for the official records exception in the absence of a defense objection. However, it appears that defendant's prior traffic citations were not based on the opinions or conclusions of the DMV's reporting employees, or that the records were based on information that was not provided by a public employee. (*People v. Dunlap*, *supra*, 18 Cal.App.4th at p. 1479.) While there was no direct evidence as to the method and time of preparation, the trial court could have relied on the presumption that official duty was regularly performed (§ 664) to conclude the records were sufficiently trustworthy. (*Dunlap*, at pp. 1479–1480.)

The DMV has a statutory obligation to record and file every application for a driver's license. (Veh. Code, § 1800, subd. (b).) The DMV must also maintain an index of granted, denied, suspended, and revoked licenses. (Veh. Code, § 1800, subds. (a)-(b)). As noted by the People, DMV records have been held to be admissible as official records under section 1280 in administrative proceedings to suspend driving privileges. (See,

59.

e.g., *Hildebrand v. Department of Motor Vehicles* (2007) 152 Cal.App.4th 1562, 1570; *McNary v. Department of Motor Vehicles* (1996) 45 Cal.App.4th 688, 694-695; *Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 639-641; *Imachi v. Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 815; *Fisk v. Department of Motor Vehicles* (1981) 127 Cal.App.3d 72, 76-79.)  In addition, computer printouts from a government-maintained criminal history database are admissible under section 1280.  (*People v. Martinez* (2000) 22 Cal.4th 106, 134-136; *People v. Morris* (2008) 166 Cal.App.4th 363, 373.)

If defendant had raised a hearsay objection at either the pretrial hearing or when Mr. Light testified, the prosecution would have been able to make the appropriate offer of proof to establish the foundational facts to satisfy the hearsay exception of section 1280. The instant record does not contain the foundational facts because defendant never raised the objection and the prosecution was not compelled to make an offer of proof. Defendant's failure to object has forfeited review of his claim that Mr. Light's testimony and the evidence was inadmissible pursuant to any statutory hearsay exception.

### 2. Sanchez

Defendant asserts Mr. Light's recitation of defendant's speeding citations "was inadmissible hearsay" in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), that *Sanchez* also held such evidence violated *Crawford*, and he was not required to object to raise the constitutional claim on appeal.  As will be explained in part VII.C., *post*, defendant was not required to raise a *Crawford* objection to preserve a constitutional claim about inadmissible testimonial hearing.  However, *Sanchez* does not excuse defendant's failure to raise a statutory hearsay objection to the prior acts evidence.

*Sanchez* held that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate *to support the expert's opinion*, the statements are hearsay."  (*Sanchez*, *supra*, 63 Cal.4th at p. 686, italics added.)  Such statements are inadmissible unless independently proven by

60.

competent evidence or covered by a hearsay exception. (*Ibid.*) *Sanchez* also held that when an "expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Ibid.*)

*Sanchez* does not apply to this case. Mr. Light did not testify as an expert about any aspects of defendant's prior traffic citations. Instead, his testimony was consistent with being a custodian of records. Mr. Light testified that he gathered certified records from the DMV about defendant's driving record and reviewed the contents of those records about defendant's prior traffic citations. Mr. Light did not analyze defendant's conduct or the nature of his behavior during the speeding incidents.

Finally, this court requested supplemental letter briefs from the parties to address whether, as a separate matter from defendant's *Crawford* argument, he preserved an objection to Mr. Light's testimony under the statutory provisions of the Evidence Code. In response, the People stated that defendant limited his arguments to whether Mr. Light's testimony was relevant, never raised a statutory hearsay objection, and forfeited a hearsay claim on appeal.

In his supplemental letter brief, defendant stated that he preserved objections under relevance, prejudice, and sections 1101 and 352. In the alternative, defendant argued his attorney was prejudicially ineffective and broadly asserts there was "no tactical justification for failing to make any objection necessary to preserve the issue," and counsel was ineffective "in failing to be more specific." In making these statements, however, defendant did not address the absence of any statutory hearsay objections at trial.

Even if defendant's supplemental letter brief could be interpreted as raising an ineffective assistance claim based on defense counsel's failure to make statutory hearsay objections to Mr. Light's testimony, such an argument is meritless because the record suggests a valid tactical reason for counsel's failure to do so. Defense counsel had

already objected to the prior traffic citations as inadmissible character evidence under section 1101, subdivision (a), and argued the prior acts evidence was unduly prejudicial under section 352. The court disagreed on both points and admitted the evidence. Defense counsel may have decided against making a statutory hearsay objection when Mr. Light testified at trial because he knew the People would have been able to satisfy the foundational requirements of section 1280 with a few questions, and his prejudice objection under section 352 had already been denied.

### C. *Crawford Argument*

Defendant's second hearsay argument is that the prior acts evidence about his speeding citations constituted inadmissible testimonial hearsay in violation of *Crawford* and his constitutional rights.

When a defendant does not specifically invoke federal Constitution error at trial, he may raise argue on appeal that the erroneous overruling of an objection actually made also had the consequence of violating his federal confrontation rights. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809.) As we have explained, defendant never raised a hearsay objection to the admission of his prior speeding citations. However, he argued the prior traffic citations were irrelevant, constituted inadmissible character evidence, and was prejudicial. We will thus address his *Crawford* argument.

"The confrontation clause of the Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him.' [Citation.] The Confrontation Clause thereby bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' [Citation.] This bar applies only to testimonial statements; admission of nontestimonial statements, while subject to state law hearsay rules, does not violate the confrontation clause. [Citation.]" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 62–63.)

"The confrontation clause 'applies to "witnesses" against the accused - in other words, those who "bear testimony." [Citation.] "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." [Citation.]' [Citation.]" (*People v. Page* (2008) 44 Cal.4th 1, 48.) At a minimum, testimonial statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and … police interrogations." (*Crawford, supra,* 541 U.S. at p. 68.) "[T]he confrontation clause addressed the specific concern of '[a]n accuser who makes a formal statement to government officers' because that person 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' [Citation.]" (*People v. Gutierrez, supra*, 45 Cal.4th at p. 813.)

We review de novo whether a statement is testimonial and therefore implicates the confrontation clause. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.) "We evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.' [Citation.]" (*Ibid.*)

Business records are admissible under section 1271 as an exception to the hearsay rule, and they are not testimonial hearsay. (*Crawford, supra*, 541 U.S. at p. 56.) In addition, "official records consisting of computerized compilations of data from multiple agencies are simply not the type of hearsay that the Supreme Court envisioned when it spoke of 'testimonial hearsay' in the *Crawford* case." (*People v. Morris*, *supra*, 166 Cal.App.4th at p. 373; *People v. Moreno* (2011) 192 Cal.App.4th 692, 709-711.)

## VIII. Cumulative error

Having found that defendant's instructional and evidentiary contentions are without merit, we similarly reject his claim of cumulative error.

## IX. The Prior Prison Term Enhancement

Defendant contends, and the People concede, that the court's true finding and the two 1-year terms imposed for the Penal Code section 667.5, subdivision (b) prior prison

term enhancements must be stricken based on the enactment of Senate Bill No. 136. (2019-2020 Reg. Sess.)

## **DISPOSITION**

Defendant's instructional and evidentiary contentions are without merit. However, the two 1-year terms imposed for the prior prison term enhancements shall be stricken. In all other respects, the judgment is affirmed.


POOCHIGIAN, Acting P.J.

WE CONCUR:


PEÑA, J.


DE SANTOS, J.

64.